**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **AUSTIN LEE TRAHAN, ET AL.,** | § | **Civil Action No. 26-714** |
| **Versus** | § | |
| **LOOP, LLC** | § | |

**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

Plaintiffs Austin Lee Trahan, Patrick Luke, Puky Seafood, L.L.C., Shrimp Kingdom Seafood, L.L.C., Willie Daisy, Travis Torres, Four Point Industries, Inc., Big D's Seafood, Inc. Segnette Oyster Co., LLC, Dannon Lacoste d/b/a DaPo Dock, Captain Jonathan Seafood, LLC, Millertime Fishing Charters, LLC, Ricky Trahan, Al's Shrimp Co., LLC, CDCG, LLC, Wholesale Transportation, LLC, Ramiro Becerril Ayala, and Louisiana Bait Products, Inc., individually and on behalf of a putative class of over 700 similarly situated individuals and entities,[1] hereby assert this Complaint for Damages and Injunctive Relief against Defendant, LOOP, LLC ("LOOP"), and in support thereof, assert as follows:

## INTRODUCTION

On February 26, 2026, over 31,500 gallons, of Venezuelan crude oil spilled from LOOP's offshore oil port into the Gulf of America and then into Louisiana territorial waters. LOOP's response to the spill was both egregiously slow and grossly inadequate. Much of the spilled heavy and sour oil traveled over 18 miles into Louisiana's territorial waters, washing upon Louisiana's

[1] A list of putative class members represented by the undersigned as of May 12, 2026, is attached hereto as Exhibit A. Only those individuals and entities specifically named herein as parties, however, are proposed Class Representatives.

coastline and causing irreparable damage to Louisiana's marine life and marshes. Numerous oyster beds were closed, and Louisiana shrimpers, crabbers, and fishermen continue to identify oil on their seafood, boats, traps, nets and other equipment on a daily basis. The timing of the spill could not be worse, as it comes right before the open of Louisiana's inland shrimping season, the peak season for crabbing, and the spawning season for oysters. Additionally, with rising fuel costs, traveling further to reach clean waters is particularly cost prohibitive. While the full economic impact of the spill cannot yet be known, it cannot be denied that the spill has already caused, and continues to cause, immense damage to those who, like Plaintiffs, depend on Louisiana's waters and coast for their livelihood. Accordingly, Plaintiffs now assert the claims set forth herein against LOOP individually and on behalf of a putative class of similarly situated entities and individuals who have suffered economic losses, cleanup costs, and/or other damages as a result of the February 26, 2026 oil spill from LOOP's offshore port.

## PARTIES

1. Plaintiff Austin Lee Trahan is an individual of full age, majority, and capacity domiciled in Terrebonne Parish, Louisiana. Mr. Trahan is a captain and a shrimp boat owner who depends on the waters and marine life of Terrebonne Parish for his livelihood.
2. Plaintiff Patrick Luke is an individual of full age, majority, and capacity domiciled in Terrebonne Parish, Louisiana. Mr. Luke is a commercial fisherman and commercial crabber who depends on the waters and marine life of Terrebonne Parish for his livelihood.
3. Plaintiff Puky's Seafood, L.L.C. ("Puky's Seafood") is a Louisiana limited liability company with its principal place of business in Houma, Louisiana. Puky's Seafood operates a fishing boat used primarily for commercial shrimping in the Louisiana territorial waters in and surrounding Terrebonne Parish.

4. Plaintiff Shrimp Kingdom, LLC ("Shrimp Kingdom") is a Louisiana limited liability company with its principal place of business in Houma, Louisiana. Shrimp Kingdom is a local seafood business and dock owner offering consumers and wholesalers with fresh seafood.

5. Plaintiff Willie Daisy is an individual of full age, majority, and capacity domiciled in Terrebonne Parish, Louisiana. Mr. Daisy is an owner of oyster leases and oyster boats who depends on the waters and marine life of Terrebonne Parish for his livelihood.

6. Plaintiff Travis Torres is an individual of full age, majority, and capacity domiciled in Terrebonne Parish, Louisiana. Mr. Torres is an oyster boat captain, oyster leaseholder, and oyster fisherman who depends on the waters and marine life of Terrebonne Parish for his livelihood.

7. Plaintiff Four Point Industries, Inc. ("Four Point Industries") is a Louisiana corporation with its principal place of business in Terrebonne Parish, Louisiana. Four Point Industries is an owner of personal property in Dulac, Louisiana, that has been damaged by the oil spill made the subject of this suit.

8. Plaintiff Big D's Seafood, Inc ("Big D's Seafood"), is a Louisiana corporation with its principal place of business in St. Mary Parish, Louisiana. Big D's Seafood operates as a commercial fin fishery that depends on Louisiana waters and marine life for its business.

9. Plaintiff Segnette Oyster Co., LLC ("Segnette Oyster Co.") is a Louisiana limited liability company with its principal place of business in Jefferson Parish, Louisiana. Segnette Oyster Co. is an oyster processor that sells wholesale Louisiana oysters.

10. Plaintiff Dannon Lacoste d/b/a Da Po Doc is an individual of full age, majority, and capacity domiciled in Terrebonne Parish. Mr. Lacoste is a crab fisherman, crab wholesaler, and crab retailer who depends on the Louisiana waters and marine life for his livelihood.

11. Plaintiff Captain Jonathan Seafood, LLC ("Captain Jonathan Seafood") is a Louisiana limited liability company that operates a seafood retail market in Jefferson Parish, Louisiana and that depends on the healthy quality and supply of Louisiana seafood.

12. Plaintiff Millertime Fishing Charters, LLC ("Millertime Fishing Charters") is a Louisiana limited liability company with its principal place of business in Terrebonne Parish, Louisiana, and that operates a business offering charter fishing trips in and around Louisiana waters and barrier islands.

13. Plaintiff Ricky Trahan is an individual of full age, majority, and capacity who is domiciled in Terrebonne Parish and who sells live bait to sport fisherman and charter fisherman in and around Terrebonne Parish.

14. Plaintiff Al's Shrimp Co., LLC ("Al's Shrimp Co.") is a Louisiana limited liability company with its principal place of business in Terrebonne Parish, Louisiana. Al's Shrimp Co. operates a business that sells dried shrimp caught in Louisiana to purchasers worldwide.

15. Plaintiff CDCG, LLC ("CDCG") is a limited liability company with its principal place of business in Severn, Maryland. CDCG operates a seafood establishment, Captain Dick's Crabs, in Arbutus, Maryland, that buys and sells Louisiana seafood as part of its business.

16. Plaintiff Wholesale Transportation, LLC ("Wholesale Transportation") is a Louisiana limited liability company with its principal place of business in New Orleans, Louisiana. Wholesale Transportation is a transporter of Louisiana seafood.

17. Plaintiff Ramiro Becerril Ayala is a person of full age, majority, and capacity domiciled in Texas City, Texas. Mr. Ayala regularly works as a deckhand on oyster boats in Houma, Louisiana.

18. Plaintiff Louisiana Bait Products, Inc. ("Louisiana Bait Products") is a Louisiana corporation with its principal place of business in Vermillion Parish, Louisiana. Louisiana Bait Products operates a business that fishes for Gulf menhaden, or "pogies," in and around Louisiana waters and sells its catch to commercial fishermen.

19. Defendant LOOP is a Delaware limited liability company registered to do and doing business in Louisiana, with its registered office and principal business establishment in this state located in Covington, Louisiana.

## JURISDICTION AND VENUE

20. Jurisdiction is proper before this Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2717(b) as Plaintiffs bring claims arising under the Oil Pollution Act ("OPA"), 33 U.S.C. § 2701, *et. seq*. This Court further has supplemental jurisdiction over Plaintiffs' other claims pursuant to 28 U.S.C. § 1367.

21. Prosecution of this action in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district, a substantial part of property that is the subject of this action is situated in this district, and the defendant resides in this district. Venue is also proper pursuant to the OPA, 33 U.S.C. § 2717(b), because the injury and damages occurred in this district and because LOOP has appointed an agent for service in this district.

# FACTUAL ALLEGATIONS

## LOOP's Operations

22. "LOOP," which stands for "Louisiana Offshore Oil Port," is a joint venture of MPL Louisiana Holdings, LLC, Marathon Petroleum Company LP, Shell USA, Inc., Shell Pipeline Company, LP, and Valero Terminaling and Distribution Company.

23. LOOP operates the "largest facility of its kind," receiving, storing, and distributing crude oil to both domestic and global refineries.[2]

24. Critical to its operations, LOOP owns and operates "the nation's only deep-water port that can both offload and load the largest supertankers in the world."[3]

25. The LOOP deep-water port (hereinafter, the "LOOP Port") is located in the Gulf of America, approximately 18 miles off of Louisiana's coast.


[4]

26. The LOOP Port stands in approximately 110-feet of water—a sufficient depth to "accommodate . . . deep draft ships."[5] Indeed, LOOP advertises as "the only port in the

[2] *See LOOP 2020 Overview,* LOOP, LLC, available at https://www.youtube.com/watch?v=2pqmwdq5H9A.
[3] *Id.*
[4] Photograph of LOOP Port. *See About US*, LOOP, LLC, at https://www.loopllc.com/about.
[5] LOOP 2020 Overview, LOOP, LLC, https://www.youtube.com/watch?v=2pqmwdq5H9A.

U.S. capable of offloading a wide range of vessels including Ultra Large Crude Carriers (ULCC) and Very Large Crude Carriers (VLCC) down to Medium Range (MR) Tankers."[6]

27. "Ships offloading and loading at LOOP are anchored at one of LOOP's three, single-point moorings." [7] Then, LOOP's "oil movement controllers, in close communication with the ship, initiate the movement of the vessel's cargo using sophisticated hoses attached to the ship's manifold."[8] When LOOP is offloading, the crude oil then flows through "a 56-inch diameter pipeline located under the sea floor."[9]


[10]

28. "When the crude oil reaches the LOOP marine terminal pumping platform, four-seven thousand horsepower pumps . . . boost the stream of crude oil into an underground pipeline."[11]

29. A "48-inch diameter pipeline [then] carries the crude toward land at rates up to 100,000 barrels per hour. When the oil leaves the platform, it moves 18 miles to Fourchon,

[6] *See About Us: History*, LOOP, LLC, https://www.loopllc.com/about/history.
[7] *See LOOP 2020 Overview*, LOOP, LLC, https://www.youtube.com/watch?v=2pqmwdq5H9A.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

Louisiana. There, a series of pumps provide the pressure needed to move the oil 23 miles further inland to LOOP's Clovelly Hub in Clovelly, Louisiana."[12]

30. At the Clovelly Hub, the crude oil is measured, segregated, and stored in a system of underground and above-ground caverns and tanks.[13]

31. When it is time to load crude oil from LOOP's onshore facility back to vessels from the offshore port, "the system is merely reversed."[14]

32. LOOP touts in its promotional video that it is "committed to protecting the public, personnel," and the "sensitive" marine environment in which it operates. LOOP further advertises that its "employees and contractors are committed to protecting the rich animal and plant life that are integral to South Louisiana and the Mississippi Delta,"[15] and that, in furtherance of this goal, LOOP has sophisticated procedures designed to prevent, mitigate, and remediate any potential spill.

33. LOOP's advertising demonstrates that it knew of the industry standards and/or standards of care expected of it, but it nevertheless failed to meet them.

34. Indeed, the falsity of LOOP's claimed commitment to "protecting" the people and environment along the Gulf Coast and its alleged "sophistication" in its ability to prevent spills, contain, and remediate spills is now on full display.

**<u>The February 26, 2026 Oil Spill</u>**

35. On or about February 26, 2026, at approximately 4:00 a.m., over 31,500 barrels of crude oil spilled from the LOOP Port into the Gulf of America.

36. Notably, the oil spilled from the LOOP Port was Venezuelan "sour" crude oil—a high-

---

[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

sulfur and low-hydrogen oil that is characterized as dense, sticky, and heavy. In fact, the oil is often so heavy that is sometimes described as a "semi-solid tar." The oil has been referred to as "the world's dirtiest oil."[16]

37. The nature of the Venezuelan crude oil makes it difficult to extract, refine, and process, and it is known to consume significant energy to transport and pose a greater risk for corroding pipelines and equipment.

38. Because of the high density and viscosity of the Venezuelan crude oil, the oil also degrades much slower than other U.S.-produced oils and is more likely to stick to the surfaces it comes into contact with, including marshland and marine life. It is difficult to clean from a shoreline and can have a severe impact on birds and mammals as it is easier to ingest.[17]

39. The Venezuelan crude has a higher propensity to form into tar balls and other semi-solid masses, which causes the masses to sink over time rendering clean-up impossible. The Venezuelan crude's high sulfur content also contributes to algal blooms in brackish water. Early season algal blooms have been observed in coastal areas impacted by the LOOP spill, showing that a spill of Venezuelan crude oil can cause a greater environmental impact.

40. Upon information and belief, LOOP knew that its systems were not equipped to handle the dense, heavy Venezuelan crude oil. Nevertheless, out of a desire for increased profits and without regard for increased risk of the failure of its equipment and potential consequences to the marine environment and people along the Gulf Coast, LOOP agreed to accept Venezuelan crude at its LOOP Port.

---

[16] *See Venezuela's Oil Resources are Vast (and Should Stay Underground)*, NRDC, https://www.nrdc.org/stories/venezuelas-oil-resources-are-vast-and-should-stay-underground#dirty.

[17] *See* Colin Campo, *Bourg Shrimping Boat Captain Returns with Oil in His Haul*, Houma Today, available at https://www.houmatoday.com/story/news/local/2026/04/01/bourg-shrimping-boat-captain-returns-with-oil-in-his-haul/89419543007/.

41. Upon information and belief, the February 26, 2026 oil spill was caused when a cargo hose owned, operated, and/or under the custody and control of LOOP failed during a transfer of crude oil from a tanker to the LOOP Port. Upon information and belief, this was the first, or one of the first, transfers of Venezuelan heavy crude to LOOP pursuant to supply contracts after the capture of Nicholas Maduro.

42. Also upon information and belief, LOOP made the decision to neglect necessary and recommended maintenance on its equipment, including the failed cargo hose, despite its knowledge that the failure to adequately maintain its equipment created a significant risk of an equipment failure and/or oil spill like that experienced on February 26, 2026. The spill was thus a product of another grossly negligent and willful decision by LOOP to prioritize profits over the safety and health of Louisiana's coast and marine life and those dependent upon it.

43. Although LOOP was immediately and/or soon thereafter aware of the significance and scope of the over-30,000 gallons of Venezuelan crude oil spilled into the Gulf, upon information and belief, LOOP intentionally misrepresented the size and scope of the spill to both the public and the authorities.

44. Indeed, on February 27, 2026 LOOP published that it "discovered crude oil near its offshore facility," but that it "immediately secured the source and activated response crews to recover the oil." LOOP further stated that "[n]o shoreline impact has been observed or is forecasted at this time."[18]

45. The fact of LOOP's failure to contain the spill was not publicized until five days later, on March 3, 2026, when LOOP provided a press release admitting that a "limited amount of

[18] *See Resources: Announcements*, LOOP, LLC, https://www.loopllc.com/resources/announcements.

crude" had been recovered from Louisiana's barrier islands.[19]

46. Even then, however, LOOP continued to downplay the significance of the spill, reporting that the spill consisted of "approximately 12,600 gallons of crude oil," with a "substantial portion" of the crude oil having been recovered.[20]

47. The March 3, 2026 press release also touted and introduced "A Unified Command—comprised of the U.S. Coast Guard, the Louisiana Oil Spill Coordinator's Office (LOSCO), and LOOP," which was "established to direct and coordinate response operations."[21]

48. By March 5, 2026, LOOP's press release was updated to provide that "[t]he updated estimate of released crude oil is 750 barrels [or 31,500 gallons] of which 616 barrels have been recovered predominantly from the offshore Gulf waters with skimmers." LOOP also announced that the federal, state, and private response to the spill included: 330 responders, 40 vessels, multiple aircrafts and drones, and over "5,000 feet of protective and collection boom."[22] By March 26, 2026, LOOP's press release noted that the response effort had been increased to 677 responders, 107 vessels, multiple types of aircraft, and 158,400 feet (or 30 miles) of protective and collection boom.

49. As evidenced by the increasing need for responders, vessels, and containment boom and other equipment, because of LOOP's inadequate initial containment efforts and failure to timely communicate the significance of the spill, substantial amounts of spilled oil made its way to the Louisiana coast and territorial waters.

[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*

50. By March 9, 2026, locals in and around Terrebonne Parish, Louisiana were reporting oil in the waters near their docks, on their boats and equipment, and on their seafood.




[23]

51. On March 14, 2026, in response to oil sheen seen in and around the waters of Terrebonne Parish, Louisiana, the Louisiana Department of Health ordered the closure of "Basin 12," or Molluscan Shellfish Areas 15, 16, 17, 18, 19, and 21, which area was not fully re-opened until April 3, 2026.

52. Despite the opening of Basin 12, locals in Terrebonne Parish and fishermen who operate in and around Terrebonne Parish and off the coast of Louisiana are continuing to find oil on their boats, equipment, and—most critically—in their daily hauls of live seafood.

[23] Photographs of oil sheen near a dock in Cocodrie and oil corked from Pass des Ilettes, provided by AMO Trial Lawyers. Photographs also published by Houma Today, https://www.houmatoday.com/story/news/local/2026/03/13/local-fishing-industry-leaders-lawyers-meet-about-loop-oil-spill/89137017007/.

53. As of this date, shrimpers and crabbers were continuing to report oil sludge on their shrimp and crabs trawled from Louisiana territorial waters.


[24]


[25]

54. Indeed, when the brown shrimp season opened in May of 2026, Louisiana shrimpers reported one of the worst season openers in history.

55. Upon information and belief, the oil spill impacted the spawning of the brown shrimp and/or the ability of the young brown shrimp to survive, severely limiting the availability of brown shrimp.

56. Moreover, not only are brown shrimp hard to find, but Louisiana shrimpers have had to travel farther east to locate any live, safe shrimp due to oil plumes from the February 26, 2026 oil spill that continue to pollute the waters.

---

[24] Photo Courtesy of Clint Buquet, Published by Houma Today. *See* Colin Campo, *Bourg Shrimping Boat Captain Returns with Oil in His Haul*, Houma Today, available at https://www.houmatoday.com/story/news/local/2026/04/01/bourg-shrimping-boat-captain-returns-with-oil-in-his-haul/89419543007/.

[25] Photograph taken by Louisiana Crabber on April 1, 2026. Credit: AMO Trial Lawyers.

57. Louisiana shrimpers, crabbers, fishermen, and others who depend on Louisiana's marine life for their livelihoods are thus having to incur additional costs, like fuel costs, to travel farther to find waters and seafood unaffected by the oil spill.

58. Indeed, the pictures below, which were taken after the season opener for inland brown shrimp in Louisiana in May of 2026, show the oil-contaminated waters and seafood that Louisiana shrimpers, crabbers, and other fishermen are now forced to navigate on a daily basis.





59. Upon information and belief, the oyster beds, fin fish, shrimp, crabs, and other marine life are, and continue to be, affected by the oil from the February 26, 2026 spill.

60. News of Louisiana's contaminated seafood has made it beyond Louisiana's borders, and wholesalers, retailers, and transporters of Louisiana seafood are suffering dramatic business losses as out-of-state purchasers and consumers have begun declining orders and shipments of Louisiana seafood due to the fear of contamination.

61. Further, in a March 30, 2026 press release, the Unified Command indicated that oil from Louisiana's marshlands will not be completely remediated. Accordingly, upon information and belief, much of the oil will simply remain in the marshes until it degrades over time—lengthening the time for actual or potential contamination to Louisiana's wildlife, marine life, and environment. The press release further indicated that the Venezuelan crude oil will

be "slow to weather as the slicks are broken into small ball shapes (tar balls), they can persist and be transported by currents."



[26]

62. Notably, these "tar balls" are now reported to have begun impacting Louisiana's coastline as far west as Cameron Parish.

63. In a May 2026 statement from a representative for the Louisiana Department of Conservation and Energy, the representative confirmed that "21% of marsh shoreline is still not cleaned up," with that "percentage represent[ing] about 54 miles of shoreline."[27] Again, upon information and belief, and due to the specific qualities of Venezuelan crude oil, much of that oil is unlikely to ever be remediated.

---

[26] Photos published in March 30, 2026 Press Release by the U.S. Coast Guard, the Louisiana Oil Spill Coordinator's Office, and LOOP, LLC, available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/ https://www.loopllc.com/docs/March%2030%20Crude%20Characteristics%20Press%20Release.pdf

[27] *'Very tough to clean up': Oil from LOOP spill remains along coastline, officials say*, 4WWL, May 20, 2026, https://www.wwltv.com/article/news/local/lafourche-terrebonne/very-tough-to-clean-up-oil-from-loop-spill-remains-louisiana-officials-admit-louisiana-terrebonne/289-8792dd0e-74ff-40ed-8030-f0e397b60b83.

**Plaintiffs' Damages**

64. Plaintiff Shrimp Kingdom Seafood is a local seafood business offering consumers and wholesalers fresh seafood. Shrimp Kingdom Seafood also operates a dock in Dulac, Louisiana, whereby Shrimp Kingdom Seafood buys and sells shrimp directly from fishermen operating in and around the waters of Terrebonne Parish and Louisiana's coast and provides other maritime services to fishermen and other docks. Because of the oil spill, Shrimp Kingdom Seafood has suffered a decrease in the supply of shrimp that it can buy and sell wholesale, directly impacting its profits and causing economic loss.
65. Plaintiff Puky's Seafood operates a fishing boat used primarily for commercial shrimping, including in the waters of Terrebonne Bay and Louisiana territorial waters in and surrounding Terrebonne Parish. As a direct consequence of the oil spill, Puky's Seafood is unable to engage in shrimping activities in its traditional shrimping locations in the waters in and around Terrebonne Parish because of the presence and/or fear of oil contamination of the waters and seafood in those areas. Further, because the oil spill decimated the brown shrimp supply in Louisiana waters, Puky's Seafood, like other shrimpers in the area, has and continues to suffer significant economic losses.
66. Plaintiff Austin Lee Trahan is a captain and a shrimp boat owner who depends on the waters and marine life of Terrebonne Parish for his livelihood. Because of the oil spill, he too is unable to engage in shrimping activities in his traditional shrimping locations in the waters in and around Terrebonne Parish because of the presence and/or fear of oil contamination of the waters and seafood in those areas.
67. Plaintiff Patrick Luke is commercial fishermen and commercial crabber who depends on the waters and marine life of Terrebonne Parish for his livelihood. As a result of the oil

spill, Mr. Luke was unable to engage in crabbing in his traditional crabbing locations in and around Terrebonne Parish due to the presence and/or fear of oil contamination of the waters and seafood. His crab traps were also contaminated with oil and required remediation.

68. Following the spill, Mr. Luke presented his damages *to date* to a LOOP claims representative at a LOOP Claim Center to discuss potential resolution. The LOOP claims representative then provided Mr. Luke with a form "Release, Receipt, and Settlement Agreement" which provided that, in exchange for a fixed sum, Mr. Luke and his "predecessors, successors, assigns, and successors in interest hereby dismiss, release and forever discharge LOOP" from any and all claims, actions, etc., "of every kind and nature, which Claimant(s) have and/or may have or acquire in the future, whether known or unknown, foreseen or unforeseen, or other claims arising out of or in any way connected or related to: (a) the Incident, and (b) the Claim."

69. When presented with the "settlement offer," Mr. Luke was told that he had to execute the release right then and there, and that he could not confer with outside counsel or his family before signing. He was also informed that, if he left, the offer would be rescinded. Under duress, without the ability to confer with an attorney, and without knowledge of his rights under OPA and any other claim he has against LOOP, Mr. Luke executed the release. As discussed further below, this agreement that purports to release any and all future claims Mr. Luke may have against LOOP violates the plain language of OPA and was obtained under duress. Insofar as the release purports to dismiss any and all future claims Mr. Luke may have against LOOP, the release is invalid.

70. Plaintiff Willie Daisy is an owner of oyster leases and oyster boats who depends on the waters and marine life of Terrebonne Parish for his livelihood. Mr. Daisy has, and continues to suffer, damages from the loss of oysters and damage to his oysters caused by the oil spill and the related loss of business.

71. Plaintiff Travis Torres is an oyster boat captain, oyster leaseholder, and oyster fisherman who depends on the waters and marine life of Terrebonne Parish for his livelihood. Because of the damage to and loss of oysters and decrease in the market for Louisiana oysters attributable to the oil spill, Mr. Torres has lost income as a captain, oyster leaseholder, and oyster fisherman.

72. Plaintiff Four Point Industries is an owner of improved and unimproved personal property in Dulac, Louisiana, that has been damaged by oil from the February 26, 2026 oil spill from LOOP's facility.

73. Plaintiff Big D's Seafood operates as a commercial fin fishery that depends on Louisiana waters and marine life for its business. Because of the active oil in the waters from which Big D's Seafood fishes and the troubled market for seafood from the waters in and around St. Mary's Parish, Big D's Seafood has suffered and continues to suffer economic losses.

74. Plaintiff Segnette Oyster Co. is an oyster processor that sells wholesale Louisiana oysters that has had problems acquiring oysters because of the lack of a market for wholesale Louisiana oysters and has suffered, and continues to suffer, damage to its business and related economic losses.

75. Plaintiff Dannon Lacoste, d/b/a Da Po Doc, is a crab fisherman who depends on the Louisiana waters and marine life for his livelihood. Mr. Lacoste works as a crab fisherman and is a crab wholesale retailer. Because of the lack of supply of Louisiana crabs

attributable to the oil spill and the stigma associated with Louisiana oysters, he has suffered and continues to suffer injury to his business and economic losses.

76. Plaintiff Captain Jonathan Seafood operates a seafood retail market in Barataria, Louisiana that depends on the healthy quality and supply of Louisiana seafood. Because of the oil spill and the related decrease in supply of local seafood and stigma against Louisiana seafood, the business has had to purchase the local seafood that is available at a premium and then has struggled to then sell that seafood to third persons, injuring the business and causing economic losses.

77. Plaintiff Millertime Fishing Charters operates a business offering charter fishing trips in and around Louisiana waters and barrier islands. Because of the oil plumes in and around Louisiana's coast and the lack of safe and clean seafood, Millertime Fishing has lost business and has had to travel farther, and incur increased costs, to provide charter fishing services for its customers.

78. Plaintiff Ricky Trahan owns a shrimp boat and sells live bait to sport fisherman and charter fisherman in and around Terrebonne Parish for his livelihood. Because of the oil spill, he has had to travel farther and incur additional costs to catch uncontaminated bait fish and has suffered, and continues to suffer, a loss of business and sales.

79. Plaintiff Al's Shrimp Co. operates a business that sells dried shrimp caught in Louisiana to purchasers worldwide. The decimated supply of brown shrimp attributable to the oil spill has forced Al's Shrimp Co. to source their shrimp from locations outside of Louisiana, resulting in increased costs and economic losses.

80. Plaintiff CDCG operates a seafood establishment, Captain Dick's Crabs, in Arbutus, Maryland, that buys and sells Louisiana seafood as part of its business. The oil spill has

caused a decrease in the supply of, and an increase in the price of Louisiana crabs, which has in turn caused CDCG to incur increased costs and loss of income.

81. Plaintiff Wholesale Transportation operates a business that transports seafood, including shrimp and crabs, from Louisiana to the East Coast. Because of the low supply of Louisianas seafood caused by LOOP's oil spill, Wholesale Transportation has suffered a significant loss of business and income.

82. Plaintiff Ramiro Becerril Ayala regularly works as a deckhand on oyster boats operating out of Houma, Louisiana. Because of the lack of clean waters and seafood in and around Terrebonne Parish and Louisiana's coast as a result of the oil spill, Mr. Ayala has suffered a lack of business and thus a decrease in income.

83. Plaintiff Louisiana Bait Products operates a business that fishes and sells Gulf menhaden or "pogies" to commercial fishermen and others and depends on Louisiana's waters and marine life for its business. The oil spill has decreased the supply of fish and, in turn, negatively impacted Louisiana Bait Products' sales and income.

84. Plaintiffs and similarly situated fishermen, shrimpers, crabbers, docks, boat owners, captains, deckhands, processors, harvesters, oyster leaseholders, distributors, wholesalers, retailers, seafood markets, seafood transporters, charter fishermen, bait suppliers, and all other individuals and business that depend on the quantity, quality, and reputation of Louisiana seafood in and around the Terrebonne Bay area and Louisiana's coast, continue to suffer physical, economic, and reputational damages as a result of the spill.

85. Property owners have also been affected, as the oil has damaged their boats, traps, docks, and other real estate.

86. These individuals rely on the affected waters for their livelihood—to support themselves and their families. The local economy of Louisiana coastal communities likewise depends on their success.

87. Plaintiffs and similarly situated individuals and businesses in the seafood industry have been, and continue to be, deeply impacted by the oil spill. Because of the spill, they have been unable to obtain seafood from their normal fishing, trawling, and/or harvesting locations; they have had to throw away seafood contaminated with oil; they have had to undergo the time and expense to clean their boats, docks, and equipment; they have had to incur additional fuel and transportation costs to find clean waters and seafood; they have been declined work due to the limited resources and access to fresh seafood; they have had their product returned due to evidence of contamination; and/or they have suffered increased costs because of the lack of supply of Louisiana seafood. The businesses, processors, and buyers and sellers of seafood have also lost income due to the decreased supply and damaged reputation to seafood from the affected areas.

88. The timing of the spill could not be worse, as it comes right before the open of Louisiana's inland shrimping season, peak season for crabbing, and spawning season for oysters. The full impact of this timing is only just beginning to unfold, as the fisherman are beginning to realize the drastic decline in live seafood from Louisiana's waters attributable to the spill. Additionally, rising fuel costs render additional travel to clean waters particularly cost prohibitive. Thus, the full economic impact to Plaintiffs and the Louisiana seafood industry as a result of this spill is not yet known.

89. Plaintiffs and those similarly situated have suffered, and continue to suffer, economic loss, reputational injury, lost profits, property damage, and emotional injury, among other damages.

90. Plaintiffs and similarly situated individuals are also being coerced by LOOP and its claims representatives into executing releases that violate OPA out of fear that failure to execute the document will result in forfeiture of any opportunity they have to recover the damages they have sustained as a result of the oil spill and/or are entering into release agreements without being fully informed of their rights to recover future damages and other rights they have under OPA. Plaintiffs are thus entitled to a temporary, preliminary, and permanent injunction directing LOOP to cease and desist its operations of the unlawful claims center and invalidating any releases obtained insofar as they purport to release the claimants' future claims.

91. LOOP is liable to Plaintiffs, including the Class of similarly situated individuals and businesses, for any and all consequential and compensatory damages, as well as for punitive and exemplary damages for LOOP's gross negligence and willful misconduct in its failure to take steps to prevent and subsequently contain the oil spill.

**<u>LOOP's "Claim Center"</u>**

92. As set forth above, in response to the spill, a "Unified Command" comprised of the U.S. Coast Guard (the "Coast Guard"), LOSCO, and LOOP was established to direct and coordinate the spill response.

93. As of the date of this filing, upon information and belief, the Coast Guard has not publicized an official designation of LOOP as the "Responsible Party" for the spill under OPA.

94. LOOP's formal designation by the U.S. Coast Guard as the "Responsible Party" for this incident, however, has been complicated by the recent 75-day partial federal government shutdown, ending April 30, 2026, which resulted in a lapse of funding to the agency and many of its employees being furloughed.[28]

95. Accordingly, it is not certain whether the Coast Guard has yet officially made this designation; however, the Coast Guard has, in all other respects, indicated to the public that LOOP is the responsible party this spill.

96. LOSCO, the state's "lead office for oil spill response," has publicly identified LOOP as the "Responsible Party."[29]

97. And, at all relevant times, LOOP has publicly admitted, and has not disputed, that it is responsible for the oil spill and that the spill came from the LOOP Port.

98. In its March 17, 2026 press release, LOOP directed claimants to file a claim with "Global Risk Solutions at 1-855-566-7552 and/or the National Pollution Funds Center at 1-800-358-2897." Global Risk Solutions is a private company hired by LOOP, acting under the direction of LOOP. The National Pollution Funds Center is a division of the U.S. Coast Guard.

99. The claims process changed on or about March 25, 2026, when LOOP issued a press release directing all potential claimants to contact LOOP's "hotline for the affected communities." The press release gives potential claimants a number to call between the hours of 8AM-7PM, when "[a]n adjuster will be assigned and make contact within 48hrs." LOOP alternatively gives claimants the option to "[c]ome to the claims office in person,

---

[28] *See Frequently Asked Questions About the 2026 Funding Lapse*, U.S. COAST GUARD, https://www.mycg.uscg.mil/News/Article/4319467/frequently-asked-questions-about-the-2026-funding-lapse/.

[29] *See* LOSCO Spill Response Records, LA. DEP'T NAT. RES., available at https://data.losco.org/PublicDetails/PublicSpillDetails/4050.

located at the: Courtyard by Marriott Houma, 142 Library Dr., Houma, LA 70360[,] between 8AM-6PM."[30]

100. The press release also directs viewers to an "Information Portal," which includes links to press releases and other updates concerning the spill. The Information Portal also includes links to a "Claims Flyer" and a "Claims Checklist."

101. The Claims Flyer titled "LOOP 104 HOSE: CLAMS PROCESS UPDATE," provides the same claims information detailed above, but indicates that the information is intended "[f]or all commercial fishers and those affected by the March 2026 oil spill."[31]

102. The "Claims Checklist," or "Claims Process Information" flyer, includes a checklist of initial personal identifying information needed to make a claim along with a "Document Checklist" intended "[t]o expedite the claims settlement process[.]" The document further states that "[p]roviding the information requested below is not a guarantee of settlement." The checklist provides a list of documents specific to "crab fishermen," "oyster fishermen," "shrimp fishermen," and "fin fish fishermen."[32]

103. To date, LOOP has held itself out as the party responsible for the oil spill, and the U.S. Coast Guard, which is charged with designating the "Responsible Party" under OPA, has directed that all members of the public, including potential claimants, to the Information Portal and, consequently, the Claims Flyer and Claims Checklist available on LOOP's website. Further, as noted above, LOSCO has identified LOOP as the "Responsible Party" for the oil spill.

---

[30] *See Announcements*, LOOP, LLC, available at https://www.loopllc.com/resources/announcements.

[31] *See* Claims Flyer, available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.loopllc.com /docs/Claims%20Flyer.pdf.

[32] *See* Claims Checklist, available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.loopllc. com/docs/Claims%20Process%20Documentation%20Checklist.pdf.

104. While a reasonable observer would presume that LOOP's advertising for the submission of claims against it is consistent with its obligations as the "Responsible Party" under OPA, LOOP's Claims Center is operating in direct contravention of the OPA statutory requirements. Indeed, LOOP's Claims Center and representatives are forcing people to sign full and final releases of any and all claims against LOOP they currently have *or may have in the future* arising from the oil spill, all without providing claimants the opportunity to consult counsel and under extreme time constraints.

105. Indeed, claimants, including Plaintiff Patrick Luke, have reported that, once at LOOP's claims office, they were presented with an offer to settle any past and future claims they have or may have against LOOP. When they asked if they could consult counsel before signing, they were told by the LOOP representative that the offer would be taken off the table if they walked out of the door without signing the full and final release.

106. The LOOP representatives have even denied claimants the ability to walk to the car to discuss signing the release with their spouses or family members—threatening that if they leave the Claims Center without signing right then and there, their offer to settle will be taken away.

107. Moreover claimants who allegedly have attempted to obtain "partial releases" have been provided with overbroad and vague releases that leave ambiguous what "claim" has actually been released and whether the claimant has preserved its right to future damages.

108. LOOP's claims representatives have even begun reaching out directly to claimants in an attempt to fully and finally resolve as many claims as possible, all while the claimants can have no appreciation for the totality of their future damages arising from this spill and are not informed of their rights against LOOP under OPA.

109. Thus, under the auspices of an OPA compliant claims process, LOOP is using duress to fraudulently obtain releases of all present and future OPA (and other) claims against it—a flagrant violation of OPA and state and federal law.

110. Indeed, OPA requires that a the responsible party for an oil spill, as LOOP is here, advertise for at least 30 days that it is the responsible party under OPA, advertise the claims processes and claimants' rights under OPA, and advertise that those damaged by the spill may present a claim *for interim, short-term damages representing less than the full amount of damages*, and that any settlement of the claim *shall not preclude recovery for any other damages, including future damages. See* 33 U.S.C. § 2714(b).

111. LOOP's advertising to potential claimants regarding its claims procedure also fails to identify OPA as a potential remedy for claimants and to provide information to claimants concerning their statutory rights—another violation of OPA.

112. For these reasons, in addition to the claimed damages as set forth herein, Plaintiffs also request temporary and permanent injunctive relief requiring LOOP to operate its claims facility in conformity with OPA requirements.

## CLASS ALLEGATIONS

113. Plaintiffs bring this action on behalf of themselves, under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), as representatives of a Class as defined below as follows:

> All individuals and entities residing or owning property in the United States who claim economic losses or damages to their occupations, businesses, and/or property as a result of the February 26, 2026 oil spill from LOOP, LLC's offshore facility.

114. **Numerosity.** Members of the Class are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class but believe that there are at least hundreds

of class members who have been impacted by this oil spill. As such, a class action is superior to other methods of adjudication due to its capacity for efficiency and its preservation of judicial economy.

115. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of LOOP.

116. **Adequacy of Representation**. Plaintiffs will fairly and adequately protect and represent the interests of the Class. The Interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class. Accordingly, by proving their own claims, Plaintiffs will prove other class members' claims as well.

117. Plaintiffs are also represented by counsel who are experienced and competent in the prosecution of class actions arising from oil spills such as this. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class.

118. **Commonality and Predominance.** There are questions of law and fact common to the class that predominate over any individual issue, including, but not limited to:

i. Whether LOOP's conduct violates the law as stated in the Causes of Action section of this Complaint, *infra*;

ii. Whether LOOP owed a duty to the Class;

iii. Whether LOOP breached any duties owed to the Class;

iv. Whether LOOP is liable to the Class under OPA;

v. Whether LOOP was negligent and/or grossly negligent in failing to properly maintain and operate its offshore port;

vi. Whether LOOP was negligent and/or grossly negligent in failing to properly maintain and operate its equipment, including but not limited to the cargo hose used to transport the crude from vessels to the LOOP Port;

vii. Whether LOOP was negligent and/or grossly negligent in its decision to accept Venezuelan crude oil at its facility;

viii. Whether LOOP was negligent and/or grossly negligent in its failure to establish proper remediation and/or containment procedures in the event of an oil spill;

ix. Whether LOOP was negligent and/or grossly negligent in its efforts to contain the oil spill;

x. Whether LOOP intentionally misled the public and/or the authorities in its communications regarding the scope and impact of the spill;

xi. Whether LOOP intentionally misled and/or deceived the public and potential claimants concerning their rights to recover from and/or assert a claim against LOOP for damages caused by the oil spill;

xii. Whether LOOP's claims process violates the procedures mandated by OPA;

xiii. Whether LOOP has waived presentment under OPA;

xiv. Whether LOOP is liable for all physical, economic, and other damages occasioned by the oil spill;

xv. Whether LOOP is liable for punitive and/or extraordinary damages because of its conduct before, during and/or after the spill;

xvi. The appropriate measurement of restitution and/or measure of damages to the Class members.

119. The questions of law and fact common to Class members predominate over any questions that may affect only individual Class members because LOOP acted on grounds generally applicable to the entire Class.

120. **Superiority.** Class treatment is a superior method for the fair and efficient adjudication of the controversy because, among other things, class treatment will permit a large number of similarly situated persons to prosecute their common claims in a similar forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons and entities with a means of obtaining redress on claims that likely would be impracticable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## CAUSES OF ACTION

### COUNT 1: LIABILITY UNDER THE OIL POLLUTION ACT

121. Plaintiffs adopt and re-allege all former paragraphs as if fully set forth and restated herein.

122. OPA, 33 U.S.C. § 2701, *et seq.*, imposes liability upon a "responsible party for a … vessel or a facility from which oil is discharged . . . into or upon navigable waters or adjoining shorelines" for damages and removal costs. 33 U.S.C. § 2702.

123. At all relevant times herein, LOOP was the owner and/or operator of the offshore facility from which the oil spill on February 26, 2026 was discharged into navigable waters,

subsequently damaging Louisiana's coast and intracoastal waterways, marine and other wildlife, and the real and personal property of the Plaintiffs. LOOP is thus a responsible party under OPA.

124. LOOP is not entitled to limit its liability arising from the oil spill under § 2704(a) because the spill was proximately caused by LOOP's gross negligence, willful misconduct, or violation of applicable federal safety, construction or operating regulations, and/or because of its failure to report the incident as required by law and/or to provide all reasonable cooperation and assistance to remediate the spill. 33 U.S.C. § 2704(c).

125. Because of the spill, Plaintiffs have suffered economic losses including lost income and lost profits, and have suffered damage to their real and personal property, along with other damages. Plaintiffs are thus entitled to recover under § 2702(2)(B).

126. As a direct result of the spill, Plaintiffs have also suffered a loss of use of natural resources, which entitles Plaintiffs to recover from LOOP under § 2707(2)(C).

127. Plaintiffs are further entitled to recover from LOOP for all economic losses arising from destruction of real or personal property, including diminution in their property value, as well as damages for "loss of profits or impairment of earning capacity" that they have suffered as a result of the spill. *See* 33 U.S.C. § 2702(b)(2)(C), (E).

128. By virtue of LOOP's failure to advertise, and/or resolve claims in accordance with the requirements of OPA, and its decision to knowingly run a non-OPA compliant claims center, LOOP has waived any presentment requirement that may apply as set forth in 33 U.S.C. § 2713. In addition and/or the alternative, Plaintiffs have satisfied, or will satisfy, all of the administrative requirements and/or conditions precedent to suit provided under 33 U.S.C. § 2713.

**COUNT 2: NEGLIGENCE AND GROSS NEGLIGENCE**

129. Plaintiffs adopt and re-allege all former paragraphs as if fully set forth and restated herein.

130. At all times relevant hereto, LOOP was the owner and/or operator of the LOOP Port from which Venezuelan crude oil spilled into the Gulf of America and into Louisiana territorial waters.

131. Upon information and belief, LOOP was also the owner and/or operator of the hose and/or other equipment that failed on February 26, 2026, causing and/or contributing to the oil spill.

132. At all material times, LOOP owed and breached duties of ordinary and reasonable care to Plaintiffs in connection with its operation of the LOOP Port, maintenance of its equipment, containment of the oil spill, and prevention of damages to Plaintiffs and Louisiana's marine and coastal environments.

133. LOOP's negligence and breach of its duties to Plaintiffs include, but are not limited to, the following:

i. Failure to properly manage, control, maintain, inspect, and operate its equipment at the LOOP Port;

ii. Failure to properly supervise and/or train its employees;

iii. Failure to act in a reasonable manner with respect to the safety of the marine and coastal environment surrounding its facility and those who depend on that environment;

iv. Failure to identify the limits and/or capacity of its facility to accept and transport Venezuelan crude oil;

v. Failure to implement appropriate procedures and processes to safeguard against oil spills;

vi. Failure to implement appropriate procedures and processes to quickly contain and remediate and/or mitigate the effects of oil spills;

vii. Failure to quickly respond, contain, and/or mitigate the effect of the oil spill;

viii. Failure to properly and quickly notify the public and authorities regarding the scope and significance of the oil spill;

ix. Failure to act in accordance with all applicable state and federal laws and regulations; and

x. Other failures to be proved at the trial of this matter.

134. LOOP knew or should have known that the failures identified above would cause Plaintiffs' claimed damages.

135. Further, upon information and belief, LOOP knew and/or should have known that its equipment and/or processes were insufficient to accommodate the heavy, dense, sour Venezuelan crude oil being transferred to its facility on February 26, 2026; regardless, it made the reckless decision to accept the oil in a desire for increased profits and without regard safety.

136. Also upon information and belief, LOOP made the grossly negligent and willful decision to neglect necessary inspections and maintenance on its equipment, including the failed cargo hose, in spite of its knowledge that this failure was likely to result in an equipment failure and spill of oil. It is further believed that LOOP made this reckless decision in an attempt to prioritize profits over the safety of Louisiana's coast and marine life and all of those dependent upon it.

137. Upon further information and belief, LOOP knew that it did not have the proper procedures and/or processes in place to contain an oil spill, but it falsely advertised the sophistication of its containment abilities to the public. Indeed, LOOP's own advertising of its alleged procedures to contain any possible oil spill demonstrates that LOOP was in fact aware of the standard of care required in such circumstances, but it failed to live up to it.

138. Upon further information and belief, despite LOOP's knowledge of the magnitude, scope, and significance of the spill of over 30,000 gallons of Venezuelan crude oil from its facility, LOOP intentionally downplayed the significance of the spill to both the public and the authorities and further misled the public and the authorities as to LOOP's ability to contain the spill, in order to avoid liability and bad publicity. LOOP's knowing decision to avoid disclosing the reality of the spill further delayed and deterred the necessary responders from reacting to the spill, causing and/or exacerbating the effects of the spill felt in and around Louisiana's territorial waters.

139. LOOP's operation of the LOOP Port giving rise to the spill and its subsequent response to the spill was grossly negligent and/or the product of reckless and willful conduct and disregard for the safety and wellbeing of Plaintiffs and the sensitive coastal and marine environment on which their livelihoods depend.

140. LOOP is accordingly liable to Plaintiffs for the damages caused by their negligence under the general maritime law and/or the applicable state law, including but not limited to Louisiana Civil Code article 2315.

141. LOOP is further liable to Plaintiffs for punitive and extra-ordinary damages as a result of their willful, wanton, and reckless conduct and gross negligence under the general maritime law and/or the applicable state law.

142. As a product of LOOP's negligence, gross negligence, and/or willful misconduct, Plaintiffs are entitled to recover any and all damages to their personal and real property, lost profits, and other economic losses, damages for annoyance, inconvenience, reputational harm, emotional distress, costs of containment and oil removal, and any and all consequential damages that they have sustained. Plaintiffs are further entitled to recover all punitive and/or exemplary damages, and attorneys' fees and costs.

**COUNT 3: TEMPORARY. PRELIMINARY, AND PERMANENT INJUNCTIVE RELIEF**

143. Plaintiffs adopt and re-allege all former paragraphs as if fully set forth and restated herein.

144. Under OPA, a responsible party who does not deny its designation as the responsible party must begin advertising, for no less than 30 days, "the designation and the procedures by which claims may be presented, in accordance with regulations promulgated by the President." *See* 33 U.S.C. § 2714(b)(1).

145. Section 2714(b)(2) goes on to provide that the advertisement must "state that a claimant may present a claim for interim, short-term damages representing less than the full amount of damages to which the claimant ultimately may be entitled and that payment of such a claim shall not preclude recovery for damages not reflected in the paid or settled partial claim."

146. As set forth herein, LOOP's advertising is not consistent with the mandates of OPA. While LOOP advertises to potential claimants and directs potential claimants to reach out to its

claims handling hotline and/or office for potential settlements, LOOP's advertising does not provide claimants with an explanation of their rights under OPA, identify LOOP as the responsible party under OPA, advise claimants that they may have claims for interim or short-term damages, or advise claimants that payment of a claim does not preclude recovery for future damages.

147. Without the benefit of the advertising of their rights under OPA, including their right to interim and short-term damage settlements and potential rights for a claim for damages under OPA, claimants are entering into releases with LOOP that purport to release LOOP of *any and all claims* the claimant *may ever have* against the company.

148. Even more egregious, LOOP's "Claim Center" and its claims representatives have forced claimants, under duress and threat of losing any potential recovery of their significant losses, to sign these fraudulent releases, releasing any and all claims, "on the spot," without the benefit counsel or the ability to even leave the Claims Center.

149. To this day, LOOP continues to advertise the availability of its Claims Center to potential claimants as a pathway for resolution of their claims without reference to OPA or the claimants' statutory rights. LOOP also continues to obtain releases of claimants' claims against them through fraud and duress.

150. In addition to the claims for damages sought herein, Plaintiffs accordingly seek an Order:

i. Directing LOOP to immediately cease and desist from any and all advertising of its hotline and Claims Center until the advertising is made to comply with the mandates of OPA;

ii. Mandating that any and all advertising will include references to claimants' rights to partially settle claims and recover interim and short-term damages without foregoing their rights to seek additional damages against LOOP in a legal action;

iii. Directing LOOP to fully advise individuals of their rights to proceed with claims under OPA in this class action and their right to contact class counsel;

iv. Directing LOOP to cease and desist its coercion of claimants into executing releases without the benefit of legal advice or other counsel and with threat of settlement offer being rescinded unless the release is executed immediately;

v. Requiring LOOP to work with the undersigned counsel, on behalf of the putative class, to reach an agreed-to claims procedure, compliant with OPA;

vi. Permitting Plaintiffs' counsel to be present at LOOP's Claims Center to ensure compliance with OPA;

vii. Invalidating releases LOOP obtained as a result of its Claims Center insofar as those releases purport to release LOOP from any and all future damages claims the claimants may have; and

viii. Recognizing that any payments made thus far are credits towards a potential full and final settlement that may ultimately be obtained at a later date.

151. Plaintiffs further request an Order from this Court invalidating any and all releases LOOP obtained as a result of its Claims Center insofar as those releases purport to release LOOP from any and all future damages claims the claimants may have. As set forth above, these releases were obtained in violation of the mandates of OPA, and they further violate state and/or general maritime law as they were fraudulently obtained under duress.

152. Plaintiffs are likely to succeed on the merits of these claims, because LOOP's claims process directly violates the procedures mandated by OPA and are in violation of general maritime law and/or state law.

153. If LOOP is not enjoined from violating the procedures mandated by OPA in administering the Claims Process and continues to fraudulently induce class members to execute releases under duress, class members will suffer the irreparable harm of having unwittingly released their claims for relief under OPA and under the general maritime and/or state law.

154. The public interest favors the release and/or waiver of legal rights *in compliance with the law, on full information, and free of duress*. The public interest also favors the avoidance of releases obtained through fraud and duress.

155. For these reasons, Plaintiffs, individually and on behalf of the Class, are entitled to a temporary, preliminary, and permanent injunction, pursuant to Federal Rules of Civil Procedure 23(b)(2), 23(d), and 65, requiring LOOP to cease and desist from administering the claims procedure in violation of OPA and common law.

## JURY TRIAL

156. Plaintiffs further request a trial by jury on all claims so triable by law.

## PRAYER

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that Defendant LOOP be served with this Complaint and duly cited to file an Answer to the same and that, after all legal delays and due proceedings are completed herein, there be judgment in favor of Plaintiffs and against Defendant LOOP as follows:

A. For all recoverable economic, consequential, compensatory, statutory, and other damages sustained by Plaintiffs, including all relief allowed under applicable laws;

B. For punitive and exemplary damages, including attorneys' fees and costs;

C. For a temporary, preliminary, and permanent injunction in Plaintiffs' favor as prayed for herein;

D. For both pre-judgment and post-judgment interest on any amounts awarded along with court costs;

E. For such other further relief, including declaratory relief, as the Court may deem just and proper.

Respectfully submitted,

**MILLER THIBODEAUX DYSART VEITH & PASCHAL, LLC**

*/s/ Kerry J. Miller*

Kerry J. Miller (#24562), T.A.
Rebekka C. Veith (#36062)
C. Hogan Paschal (#38495)
Monica L. Bergeron (#39124)
643 Magazine Street, Suite 405
New Orleans, LA 70130
Telephone: (504) 977-9150
Facsimile: (504) 977-9151
kmiller@mtdvp.com
rveith@mtdvp.com
hpaschal@mtdvp.com
mbergeron@mtdvp.com

***AND***

**AMO TRIAL LAWYERS, LLC**
David W. Ardoin, L.B.N. 24282
Preston L. Hayes, L.B.N. 29898
Ryan P. Monsour, L.B.N. 33286
640 West Third Street
Thibodaux, LA 70301
Telephone: (985) 446-3333
Facsimile: (985) 446-3300

david@amotriallawyers.com
plh@amotriallawyers.com
rpm@amotriallawyers.com

***AND***

**ORY LAW GROUP, LLC**
Matthew D. Ory, LA Bar No. 31906
312B East Bayou Rd.
Thibodaux, LA 70301
matt@askforory.com

***AND***

**ST. MARTIN & BOURQUE**
CHARLES C. BOURQUE, JR. (#20118)
cbourque@stmblaw.com
CHRISTOPHER J. ST. MARTIN (#26122)
cstmartin@stmblaw.com
JOSEPH G. JEVIC, III (#23145)
jjevic@stmblaw.com
315 Barrow St.
Houma, LA 70360
Telephone: (985) 876-3891
Fax: (985) 851-2219

**CERTIFICATE OF SERVICE**

I do hereby respectfully submit that on this 3rd day of June, 2026, I served a copy of the foregoing on all counsel of record by filing with this Court's CM/ECF system.

*/s/ Kerry J. Miller*
KERRY J. MILLER